THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| AMERICAN ROCKY MOUNTAINEER, <br><br> Plaintiff, <br><br> v. <br><br> GRAND COUNTY, STATE OF UTAH, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 4:21-cv-72-DN-PK <br><br> District Judge David Nuffer |

This action arises out of a permitting process imposed by Grand County, Utah on a rail service provided by American Rocky Mountaineer ("ARM"). Grand County seeks to require ARM to meet a series of permitting requirements before ARM can operate a temporary train station in Grand County.[1] ARM filed a complaint seeking a declaratory judgment that the permitting process was preempted by federal law, and subsequently filed a motion for summary judgement ("Motion").[2] Grand County filed a response in opposition to the Motion ("Response").[3] ARM filed a reply. ("Reply").[4] The parties were heard in a hearing on October 4, 2021.[5] For the reasons stated below, the Motion is GRANTED.

---

[1] The parties have entered into a stipulation for temporary operation during the 2021-2022 season while this litigation is pending. Notice of Stipulation Regarding Operation of Plaintiff's Passenger Rail Service, docket no. 16, filed August 6, 2021.

[2] Plaintiff's Motion for Summary Judgment, docket no. 13, filed July 20, 2021.

[3] Grand County's Response in Opposition to Plaintiff's Motion for Summary Judgment, docket no. 17, filed August 17, 2021.

[4] Reply in Support of Plaintiff's Motion for Summary Judgment, docket no. 24, filed September 3, 2021.

[5] Docket no. 29, filed October 4, 2021.

**Contents**
Background ........................................................................................................................ 2
    ARM's Attempts to Secure Approval for the Station ...................................................... 2
    Conditional Use Permit Requirement ............................................................................. 3
    Additional Specific Land Use Requirements ................................................................. 3
    Final Statement of Land Use Requirements .................................................................. 4
    Business License Requirements ..................................................................................... 5
    Litigation and Pending Motion ....................................................................................... 6
Discussion .......................................................................................................................... 6
    ICCTA and STB – An Exclusive, Preemptive, National Regulatory Scheme for Railroads
    ..................................................................................................................................... 6
    The ICCTA Prohibits Local Preclearance Permitting for Railroads Even If Based on
        Public Health and Safety ............................................................................................ 10
    Overview of Grand County's Land Use Code Provisions ............................................ 13
    Grand County's Conditional Use Permit Requirement is Preempted ........................... 13
        Grand County's CUP Process is a Prohibited Permitting Process ........................ 14
        The Grand County CUP Process is Too Indefinite to Survive Pre-emption ......... 15
    The Grand County Business License Requirements Are Preempted ............................ 18
Conclusion and Order ..................................................................................................... 18

# BACKGROUND[6]

ARM is a Delaware corporation which has been developing a luxury rail service between Denver, Colorado, and Moab, Utah. ARM has leased property in Grand County, Utah, near Moab[7], to serve as a loading and unloading station (the "Station") for passengers.[8] Currently, ARM intends for the Station to only serve as a temporary staging area without any permanent structures.[9]

### ARM's Attempts to Secure Approval for the Station

In 2020, ARM began communications with Grand County's Planning and Zoning Department, seeking regulatory approval of the Station.[10] Initially, due to its belief that all

---

[6] These facts are drawn from the Undisputed Material Facts and Additional Material Facts sections of the Motion and Opposition.

[7] Motion at 10-11; Opposition at 7.

[8] Motion at 11; Opposition at 7.

[9] Motion at 11; Opposition at 8.

[10] Motion at 12; Opposition.

activity was taking place in a preexisting right-of-way, Grand County only required ARM to provide a business license application and a site plan.[11]

### Conditional Use Permit Requirement

In April 2021, Grand County informed ARM through email that it would now require a Conditional Use Permit ("CUP") application before ARM could commence operations.[12] In the same email, Grand County indicated it would require "at a minimum," pursuant to Grand County Land Use Code ("LUC") §§ 3.2.4 N and 9.11, a site plan and letters of acceptance from various agencies, include (1) the Utah Department of Transportation ("UDOT"), (2) the State Sanitarian, (3) Grand County Engineering, and (4) Grand County Building Department, as well as a letter for approval from Union Pacific, a railroad that did business in the area.[13] Grand County also referenced a public hearing requirement that would need to be fulfilled prior to issuance of the CUP.[14]

### Additional Specific Land Use Requirements

As communications continued between Grand County and ARM, and more information was exchanged regarding the proposed Station, Grand County's list of requirements continued to grow. In June, Grand County informed ARM that to obtain a CUP, ARM must also provide statements that no public services would be required; that no facilities remain onsite after the close of business; and that no infrastructure is being constructed.[15] Grand County also indicated

---

[11] Email from Elaine Gizler, March 11, 2021 2:07 PM, and email from Court Edeburn Thu, Mar 11, 2021 at 3:33 PM, Exhibit no. 5 to the Motion, docket no. 13-6, at 2-3, filed July 20, 2021.

[12] Email from Mary Hofine, April 15, 2021 10:50 AM, Exhibit no. 6 to the Motion, docket no. 13-7, at 7, filed July 20, 2021.

[13] *Id*.

[14] *Id*. at 4.

[15] Email from John Guenther, June 7, 2021, 3:48 PM, Exhibit no. 8 to the Motion, docket no. 13-9, at 5-6, filed July 20, 2021.

that ARM might no longer need to have a public hearing, as that requirement was inconsistent with state law and Grand County was in the process of amending its ordinance.[16] In July, Grand County informed ARM that the submitted site plan also required inclusion of the radius of ingress of HWY 313; radius of the turnaround to enter the property; an "all-weather surface;" a "minimum acceptable driveway width;" and, potentially, a grading permit.[17] Grand County also clarified that it was only requiring ARM to meet some of the requirements of LUC 3.2.4.N; namely, the requirements that were "health and safety related."[18]

## Final Statement of Land Use Requirements

Grand County's final requirements were that ARM provide seven items in its CUP application:

(1) A letter from Union Pacific approving ARM's use of the rail line;

(2) a UDOT access permit (if required by UDOT);

(3) a statement that no public services would be required;

(4) a traffic analysis if required by UDOT;

(5) a site plan showing legal access, parcel size, ownership of each affected parcel, and any land use conflicts or impacts, along with showing:

> (a) a depiction of where buses turn around ("traffic circulation") including selected spur line/track, drop off, loading and unloading;
>
> (b) legal access to titled parcels;
>
> (c) Hard surface modifications and drainage implications; and
>
> (d) A statement that no other services or construction are anticipated at this time;

---

[16] *Id*. at 4.

[17] Email from Christina Sloan, Friday, July 2, 2021 7:57 PM, Exhibit no. 7 to the Motion, docket no. 13-8, at 6, filed July 20, 2021.

[18] *Id*.

(6) a statement that no facilities remain onsite after close of business, to show that a security plan is not required; and

(7) a statement that no infrastructure is being constructed, to show that a reclamation plan is not required.[19]

## Business License Requirements

Grand County also required ARM to provide a business license application.[20] Grand County Code § 5.01.080(A) ("Title Five") requires that a business license application contain:

1. The name and contact information of the Person to whom the license shall be issued;

2. The nature of the Business;

3. The Principal Office Address;

4. The mailing address, if different;

5. The place of Business, if different;

6. A Fleet Inventory, as applicable;

7. A Noise Compliance Certificate, as applicable;

8. The signatures of various County officials and designees;

9. Fee(s) established by the Grand County Consolidated Fee Schedule, prorated on a quarterly basis for applications submitted after Quarter 1 (January-March); and

10. Additional documentation as the County may reasonably require.[21]

Prior to July 2021, Grand County Code § 5.01.030 (B)(ii) allowed reciprocity for business licenses which had been issued by the City of Moab.[22] In June 2021, ARM emailed Grand County its Moab business license application, informing Grand County it believed this qualified it for a business license under Grand County Code § 5.01.030(B)(ii).[23] Grand County

---

[19] Motion at 14-15.

[20] Email from Christina Sloan, Thursday, June 10, 2021 3:54 PM, Exhibit 8 to the Motion at 2.

[21] Grand County Code § 5.01.080(A).

[22] Motion at 17.

[23] *Id*.

did not respond to this email, and on July 5, 2021, it amended Grand County Code § 5.01.030(B)(ii) to clarify that the reciprocity was only applicable to businesses which did not have a physical location in Grand County.[24] Accordingly, the business license requirements in Title Five applied to ARM's application.

## Litigation and Pending Motion

ARM filed a complaint seeking a declaratory judgment that the CUP scheme was preempted by federal law.[25] Subsequently, ARM filed a motion for summary judgment, arguing that the CUP process was preempted as a matter of law.[26] ARM argues that because the CUP process is a preclearance requirement, it is categorically preempted.[27] Grand County responds that the CUP process is a permissible exercise of Grand County's police power to regulate health and safety.[28]

## DISCUSSION

For much of the United States' history, Congress has regulated interstate railways under the power of the Commerce Clause.[29] The Supreme Court has long recognized the preclusive effect of these regulations.[30]

**ICCTA and STB – An Exclusive, Preemptive, National Regulatory Scheme for Railroads**

In 1995, in an attempt to further reduce local regulatory controls over the railway industry, Congress passed the Interstate Commerce Commission Termination Act of 1995 (the

---

[24] Motion at 18; Grand County Code § 5.01.030(B)(ii).

[25] Complaint at 2.

[26] Motion at 7.

[27] Motion at 17.

[28] Opposition at 10.

[29] *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029 (9th Cir. 1998), as amended (Oct. 20, 1998).

[30] *Id.*

"ICCTA").[31] The ICCTA aimed to prevent "the development of a patchwork of local and state regulations affecting the railroad industry," as such a patchwork would be detrimental to a uniform railway system.[32] Accordingly, the previous system of dual regulation between local and federal governments was eliminated and replaced with a system of regulation entirely by the federal government.[33]

Among other provisions, and consistent with prior law, the ICCTA contains a clause which states that "the remedies provided under this part with respect to regulation of rail transportation are exclusive" and that the statute expressly preempts "remedies provided under Federal or State law."[34] This preemption is an exercise of congressional power under the Commerce Clause.[35] The ICCTA defines rail transportation as

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.[36]

The ICCTA created the Surface Transport Board ("STB"), an agency tasked with regulating and administering "almost all matters of rail regulation."[37] After the passage of the ICCTA, direct regulation of rail transport became the exclusive province of the STB.[38] Specifically, the STB has exclusive jurisdiction over

---

[31] See *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1337 (11th Cir. 2001)

[32] 2 A.L.R. Fed. 3d Art. 3 (Originally published in 2015).

[33] *Burlington Northern Santa Fe Corporation, BNSF Acquisition Corp., and Burlington Northern Railroad Company*, 1996 WL 502000, at *43 (S.T.B. 1996), corrected, 1996 WL 512025 (S.T.B. 1996).

[34] 49 U.S.C.A. § 10501(b).

[35] City of Auburn, 154 F.3d at 1031.

[36] 49 U.S.C.A. § 10102(6).

[37] *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).

[38] *Burlington Northern Santa Fe Corporation*, 1996 WL 502000, at *43.

> "(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and, (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State."[39]

As the agency authorized by Congress to administer the [ICCTA], the [STB] is uniquely qualified to determine whether state law should be preempted by the [ICCTA]."[40]

The STB has identified two ways in which the ICCTA preempts state regulation of rail transportation. First, certain regulations are categorically preempted, "regardless of the context or rationale for the action."[41] Second, "those state actions that do not fall into one of these categories may be preempted as applied . . . ."[42] While the Tenth Circuit has labeled these categories as "express" and "implied", those terms are functionally equivalent to the terms the STB uses.[43]

**Categorical Preemption:** Two types of regulations are categorically preempted. The first type is "any type of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations . . . ."[44] The second type is "state or local regulation of matters directly regulated by the [STB]," such as mergers and acquisitions or railroad rates and services.[45] Of particular concern to the STB are pre-clearance

---

[39] 49 U.S.C. § 10501(b)(1) & (2).

[40] *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1130 (10th Cir. 2007) (quoting *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir.2005)) (some alterations in original).

[41] *CSX Transportation, Inc.--Petition for Declaratory Ord.*, No. FIN 34662, 2005 WL 1024490, at *2 (S.T.B. 2005).

[42] *Adrian & Blissfield R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 540 (6th Cir. 2008).

[43] *See Emerson*, 503 F.3d at 1129-1133.

[44] *Id.* at 1130 (quoting *CSX Transportation, Inc.--Petition for Declaratory Ord*, 2005 WL 1024490, at *2).

[45] *Id*.

requirements which, by their nature, could be used to prevent activities which the STB has authorized.[46]

**As-Applied Preemption:** In those instances where a regulation is not facially preempted, but still touches on railway transportation, courts typically apply the "as-applied" test to determine if a regulation is implicitly preempted. A state regulation is not preempted under the as-applied test as long as "(1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads."[47] To determine if a regulation is preempted "requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation."[48] However, a factual assessment is not required for regulations that are categorically preempted.[49]

Not all state regulations which affect railway transportation are preempted by the ICCTA. "[S]tate and local regulation [of railways] is permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety."[50] Fire, plumbing, and electrical codes, generally applicable environmental regulations which do not completely restrain railway operations, and similar incidental regulations all would appear to survive preemption, so long as the regulation survives the as-applied preemption test.[51] But this police power exception to preemption is limited. "[S]tates are not free to impose any requirements they wish in the name of their police power[, and] it is well settled that states

---

[46] *CSX Transportation, Inc.--Petition for Declaratory Ord*, 2005 WL 1024490, at *2.

[47] *Adrian & Blissfield R. Co.*, 550 F.3d at 541 (quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir.2007))

[48] *Emerson*, 503 F.3d at 1133 (quoting *CSX Transp., Inc.*, 2005 WL 1024490, at *3).

[49] *See Adrian & Blissfield R. Co.*, 550 F.3d at 540.

[50] *Emerson*, 503 F.3d at 1133 (quoting *Maumee & W. R.R. Corp. and RMW Ventures, LLC—Petition for Declaratory Order*, 2004 WL 395835, at *1 (S.T.B. 2004)).

[51] *See Green Mountain R.R. Corp.*, 404 F.3d at 643.

cannot take an action that would have the effect of foreclosing or unduly restricting a railroad's ability to conduct any part of its operations . . . ."[52] While a municipality may impose fines or other similar penalties for noncompliance with appropriate regulations, a municipality may not prevent a railroad from commencing operations by mandating permitting or other preclearance requirements before railway operations can begin.[53]

### The ICCTA Prohibits Local Preclearance Permitting for Railroads Even If Based on Public Health and Safety

Grand County argues that if a railroad *permitting* regulation directly relates to public health and safety, and is imposed pursuant to a state's police power, it survives categorical preemption. That argument is unsupported by the case law. Both the STB and numerous circuit courts have held that "*any* type of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations" is categorically preempted.[54] The Tenth Circuit has favorably cited this language.[55]

Grand County's argument confuses the two types of pre-emption – categorical and as-applied. There is no exception to the ban of preclearance requirements which would allow them if related to health and safety or issued under a state's police power. Enforcement of these health and safety requirements can occur by cooperation, fine, or another mechanism that does not stop the operations of the railway.[56] The S.T.B. has suggested that such mechanisms have a lesser

---

[52] *See CSX Transportation, Inc.--Petition for Declaratory Ord*, 2005 WL 1024490, at *4.

[53] *Cities of Auburn & Kent, Wa-Petition for Declaratory Ord.-Burlington N. R.R. Co.-Stampede Pass Line*, 1997 WL 362017, at *5-6. (S.T.B. 1997).

[54] *Id*. (emphasis added); *see also New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008); *Adrian & Blissfield R. Co.*, 550 F.3d at 540; *City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016).

[55] *Emerson*, 503 F.3d at 1130.

[56] *See Cities of Auburn & Kent, Wa-Petition for Declaratory Ord.*, 1997 WL 362017, at *6.

degree of interference with interstate commerce.[57] But preclearance requirements that restrain a railway's operations are categorically preempted, regardless of the rationale behind them.[58]

Grand County cites *Green Mountain R.R. Corp. v. Vermont*, a Second Circuit case, to bolster its arguments. In *Green Mountain*, Vermont attempted to impose a permit requirement on a transloading facility a railway was constructing.[59] The Second Circuit held the permit requirement was preempted by federal law. The court stated in dictum that "generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption,"[60] However, *Green Mountain* does not hold that a permit requirement directly regulating railways which relates to health and safety survives preemption. To the contrary, the *Green Mountain* court favorably cited numerous cases which held that pre-clearance or pre-construction permitting was categorically preempted.[61] A careful examination of the language in *Green Mountain* reveals that the statement regarding "generally applicable, non-discriminatory regulations and permit regulations" was made in reference to fire, electrical, plumbing, and similar regulations not at issue in the case.[62] Permitting which prevents *any* railway operations until a permit is granted is very different from those types of regulations. Permitting restrains all rail services before commencement, "unduly interfere[ing] with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations."[63]

---

[57] *Id*.

[58] *CSX Transportation, Inc.--Petition for Declaratory Ord*, 2005 WL 1024490, at *2.

[59] *Green Mountain R.R. Corp.*, 404 F.3d at 640.

[60] *Id*. at 643.

[61] *Id*.

[62] *Id*.

[63] *Id*.

11

Other courts which have quoted this language in *Green Mountain* have done so in the context of an as-applied analysis.[64] Fire, electrical, plumbing, and similar regulations may survive an as-applied preemption analysis if they are permissible exercises of police power, but preclearance requirements are always preempted.[65]

The STB—as well as numerous other circuits[66]—has repeatedly held that preclearance requirements are categorically preempted, regardless of whether they are implemented for the purposes of health and safety. For example, the STB held in 2001 that "state and local permitting or preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations."[67] Similarly, in 2005, the STB held that a District of Columbia statute preventing transportation of hazardous materials by rail near the United States Capital was preempted because it "plainly fell" within the "categorical preemption against state and local permitting process," even though the District of Columbia argued that the statute was aimed at protecting public safety.[68] The Board acknowledged that a state's police powers are not entirely preempted by the ICCTA, but nonetheless concluded that "states are not free to impose any requirements they wish in the name of their police power."[69] Because the STB is the agency authorized by Congress to administer the ICCTA, it is "uniquely

---

[64] *See, e.g. Jackson*, 500 F.3d at 254. Although *Jackson* does not explicitly identify its preemption analysis as as-applied, later decisions within the circuit clarify that *Jackson* uses an as-applied preemption analysis, as the Third Circuit has not adopted the categorical preemption analysis. *Benton v. CSX Transportation*, No. CV 19-109, 2021 WL 3099502, at *6 (E.D. Pa. July 21, 2021).

[65] *Joint Petition for Declaratory Ord. - Bos. & Maine Corp. & Town of Ayer, Ma*, 5 S.T.B. 500, 2001 WL 458685, at *5 (S.T.B. 2001).

[66] *See, e.g., Barrois*, 533 F.3d at 332 (5th Cir. 2008); *Adrian & Blissfield R. Co.*, 550 F.3d at 540; *City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016).

[67] *Bos. & Maine Corp. & Town of Ayer, Ma*, 2001 WL 458685, at *5.

[68] *CSX Transportation, Inc.--Petition for Declaratory Ord.*, 2005 WL 1024490, at *4.

[69] *Id*.

qualified to determine whether state law should be preempted,"[70] and its interpretation of the preemptive scope of the ICCTA should be given considerable weight.[71] Furthermore, Grand County has not cited a case where a preclearance permitting requirement was not preempted. If a regulation imposes a preclearance permitting requirement, it is categorically preempted by the ICCTA, even if the regulation is directed at public health and safety.

### Overview of Grand County's Land Use Code Provisions

The applicable regulations here, regulating issuance of CUPs, are Grand County Land Use Code § 3.2.4 N and § 9.10. § 3.2.4 N lists the specific minimum requirements a rail facility must meet before it can be approved by the Grand County Planning Commission. § 9.10 establishes standards for approval or denial of CUPs. § 9.10.5, referencing Utah Code § 17-27a-506, requires a CUP to be approved if reasonable conditions are proposed or can be imposed to migrate the reasonably anticipated detrimental effects of the proposed use. However, § 9.10.6 allows denial of a CUP if the reasonably anticipated detrimental effects of a proposed conditional use cannot be substantially mitigated by the proposal or by the imposition of reasonable conditions. The decision by Grand County to approve or deny a CUP must be supported by "substantial evidence."[72]

### Grand County's Conditional Use Permit Requirement is Preempted.

The challenged regulations arise out of a series of requirements ARM must meet in order to receive a conditional use permit ("CUP"). Grand County has informed ARM that to receive a CUP, ARM must provide (1) a letter from the owners of a rail line approving ARM's use of the

---

[70] *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1584 (N.D. Ga. 1996) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996)).

[71] *Emerson*, 503 F.3d at 1130 (quoting *R.R. Ventures, Inc. v. Surface Trans. Bd.*, 299 F.3d 523, 548 (6th Cir. 2002)).

[72] *Uintah Mountain RTC, L.L.C. v. Duchesne Cty.*, 2005 UT App 565, ¶ 19, 127 P.3d 1270 (quoting *Ralph L. Wadsworth Constr., Inc. v. West Jordan City*, 2000 UT App 49, ¶ 9, 999 P.2d 1240)

rail line; (2) a UDOT Access Permit; (3) a statement that no public services would be required; (4) a traffic analysis; (5) a site plan; (6) a statement that no facilities remain onsite after the close of business; and (7) a statement that no infrastructure is being constructed.[73] If ARM is not able to meet these requirements, Grand County will not approve a CUP, and ARM will be unable to commence railway operations.[74]

***Grand County's CUP Process is a Prohibited Permitting Process***

What Grand County seeks to do is what "Congress expressly precluded: interfere with interstate commerce by imposing a local permitting or environmental process as a prerequisite to the railroad's ability to conduct its operations."[75] While the ICCTA does not preempt incidental regulation of railways, "[t]here is nothing 'incidental' about a preclearance requirement imposed by a local county."[76] Here, ARM is restrained from railway operations until it meets the preclearance requirements imposed by Grand County even though the operations have been approved by the STB,. Because the CUP process is a preclearance permitting process, it is therefore preempted by federal law.

Even if the permitting process for ARM had been clearly delineated throughout the process, and ARM's application had been promptly approved, the process would be preempted by federal law. "[W]hat is preempted here is the permitting process itself, not the length or outcome of that process in particular cases."[77] The relevant concern is not the process that ARM is currently undergoing, but rather if the permitting scheme could potentially allow a local

---

[73] Exhibit 7 at 5.

[74] *Id*.

[75] *Bos. & Maine Corp. & Town of Ayer, Ma*, 2001 WL 458685, at *6.

[76] *See BNSF Ry. Co. v. Clark Cty.*, 438 F. Supp. 3d 1199, 1205 (W.D. Wash. 2020), aff'd sub nom. BNSF Ry. Co. v. Clark Cty., Washington, No. 20-35205, 2021 WL 3730738 (9th Cir. Aug. 24, 2021)

[77] *Green Mountain*, 404 F.3d at 644.

government to deny a carrier the right to initiate or carry on operations.[78] A permitting scheme such as this one could be used "as a pretext for interfering with or curtailing rail service."[79] There is no indication Grand County's efforts surrounding ARM's CUP application are motivated by anything other than genuine concern for local health and safety. However, because of the *potential* this scheme has to interfere with interstate commerce, it is nonetheless preempted.

While some of Grand County's seven requirements for ARM to obtain a CUP may have been permissible had they been imposed outside a permitting process, they were imposed as part of a permitting scheme. Accordingly, the seven requirements are preempted as well.[80]

### *The Grand County CUP Process is Too Indefinite to Survive Pre-emption*

Even if the Grand County preclearance permitting was not preempted categorically, its discretionary nature requires pre-emption.[81] A regulatory scheme "must be settled and definite enough to avoid open-ended delays."[82] To survive preemption, "rules must be clear enough that the rail carrier can follow them and that the [municipality] cannot easily use them as a pretext for interfering with or curtailing rail service."[83] Therefore, preclearance permitting schemes that allow a municipality significant discretion on subjective questions are preempted.[84]

The CUP process necessarily involves discretion on the part of Grand County. A municipal authority has significant insulation from judicial review of a land use decision. The

---

[78] *Green Mountain*, 404 F.3d at 643.

[79] *Jackson,* 500 F.3d at 254.

[80] See *Bos. & Maine Corp. v. Town of Ayer*, 191 F. Supp. 2d 257, 262 (D. Mass. 2002).

[81] See *Green Mountain*, 404 F.3d at 643.

[82] *Jackson,* 500 F.3d at 254.

[83] *Id*.

[84] See *Green Mountain R.R. Corp.*, 404 F.3d at 643.

decision to approve or deny a CUP need only be supported by "substantial evidence."[85] "Substantial evidence" means that "quantum and quality of relevant evidence" which could "persuade a reasonable mind."[86] A substantial evidence standard, being "more than a mere scintilla of evidence [but] something less than the weight of the evidence"[87] is "highly deferential" to a land use authority's decision.[88] Because a municipality's decision need only be one "a reasonable mind could reach,"[89] and a court does "not weigh the evidence anew or substitute [its] judgment for that the municipality",[90] a court has very little ability to prevent a municipality from denying a land use or to scrutinize its decision making process.

Grand County is not limited in its decision to objective, readily ascertainable criteria. Instead, Grand County must approve a CUP if "if reasonable conditions are proposed, or can be imposed, to mitigate the reasonably anticipated detrimental effects of the proposed use in accordance with applicable standards."[91] Grand County may deny a CUP "if the reasonably anticipated detrimental effects of a proposed conditional use cannot be substantially mitigated . . . ."[92] The determination of what is "reasonably anticipated," what "reasonable criteria" are, and the "applicable standards" necessarily involves discretion on behalf of Grand County, as those

---

[85] *Staker v. Town of Springdale*, 2020 UT App 174, ¶ 24, 481 P.3d 1044.

[86] *Checketts v. Providence City*, 2018 UT App 48, ¶ 18, 420 P.3d 71 (quoting *Pacific West Communities, Inc. v. Grantsville City*, 2009 UT App 291, ¶ 22, 221 P.3d 280).

[87] *Watson v. Lab. Comm'n*, 2020 UT App 170, ¶ 16, 480 P.3d 353 (quoting *Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶ 35, 164 P.3d 384)

[88] *Checketts*, 2018 UT App 48 ¶ 19, 420 P.3d 71.

[89] *Staker*, 2020 UT App 174 ¶ 24, 481 P.3d 1044 (quoting *Checketts*, 2018 UT App 48, ¶ 18, 420 P.3d 71).

[90] *Staker*, 2020 UT App 174 ¶ 24, 481 P.3d 1044 (quoting *LJ Mascaro Inc. v. Herriman City*, 2018 UT App 127, ¶ 20, 428 P.3d 4).

[91] Grand County LUC § 9.10.5; Utah Code § 17-27a-506.

[92] Grand County LUC § 9.10.6(b).

terms are not defined in the Land Use Code and localities in Utah are delegated considerable discretion by the state in making land use determinations.[93]

Utah law allows a CUP to be denied for as nebulous as a reason as a "change [in] the appearance and character of" an area, so long as that decision is supported by "substantial evidence" as to what that character is and why land use would interfere with it.[94] Similarly, the Grand County LUC includes as required criteria "the character of the surrounding area" and "consistency with the purposes" of the LUC.[95] Although any decision Grand County makes must be supported by substantial evidence under state law, these criteria allow wide latitude to approve or deny a CUP application. The Grand County CUP process is not the type of "settled and defined" scheme involving no "exercise of discretion on subjective questions" which courts have indicated may survive preemption.[96]

As evidence of the discretionary nature of the CUP process, Grand County's CUP requirements have shifted and grown over the course of ARM's communications with Grand County. Although Grand County argues that these requirements were communicated as soon as ARM provided relevant information, many requirements appeared to be independent of newly provided information or otherwise be within the discretion of Grand County to impose. For example, Grand County did not inform ARM it required an "all weather surface" and potentially a "grading permit" until July 2021.[97] Although Grand County argues that these requirements had "always been subsumed in the [C]ounty's request for a site plan"[98], there is no easily discernable

---

[93] See *Naylor v. Salt Lake City Corp.*, 16 Utah 2d 192, 194 (1965).

[94] See *Staker*, 2020 UT App 174 at ¶ 8, 481 P.3d at 1047.

[95] Grand County LUC § 9.10.6(b).

[96] See *Green Mountain*, 404 F.3d at 643.

[97] Exhibit 7 at 3.

[98] Opposition at 11.

way to determinate what exactly these requirements were prior to the submission of a CUP application, or any reason to think Grand County could not continue to require ARM to submit letters of approval from different agencies. Furthermore, in an email in June 2021, Grand County indicated that some of the requirements in LUC 3.4.2.N had been "narrowed" for the purpose of ARM's application, eliminating certain requirements that were not related to health and safety.[99] If Grand County is able to waive certain requirements, that suggests the requirements it does choose to enforce also involves a degree of discretion.

### The Grand County Business License Requirements Are Preempted

To the extent the Business License requirements are separate from the CUP scheme, as discretionary preclearance requirements, they are preempted as well. Title Five gives Grand County a great deal of discretion in setting requirements for a business license. For example, Grand County is permitted to require any "[a]dditional documentation as the County may reasonably require."[100] The County Code does not specify what documentation this can consist of. Because "issuance of the [business license] awaits and depends upon the discretionary rulings of a state or local agency,"[101] the Business License requirements are also preempted.

### CONCLUSION AND ORDER

The CUP scheme is a preclearance permitting process and involves discretionary approval by Grand County. Accordingly, when applied to railways, it is categorically preempted by federal law for both those reasons. The Grand County Business License requirements are also

---

[99] 13-8 at 2.

[100] § 5.01.080(A)(10).

[101] See *Green Mountain*, 404 F.3d at 643,

preempted. ARM's Motion[102] is GRANTED. A declaratory judgment will be entered reflecting this opinion.

    The clerk is directed to close the case.

    Dated October 21, 2021

BY THE COURT

_____
David Nuffer
United States District Judge

---

[102] Docket no. 13, filed July 20, 2021.